**THIERMAN BUCK LLP**
MARK R. THIERMAN, SB# 8285
JOSHUA D. BUCK, SB# 12187
LEAH L. JONES, SB# 13161
JOSHUA R. HENDRICKSON, SB# 12225
7287 Lakeside Drive
Reno, NV 89511
Tel: 775.284.1500
Fax: 775.703.5027
mark@thiermanbuck.com
josh@thiermanbuck.com
leah@thiermanbuck.com
joshh@thiermanbuck.com

ATTORNEYS FOR PLAINTIFFS

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| CHRISTOPHER NELSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>WAL-MART ASSOCIATES, INC., and DOES 1 through 50, inclusive,<br><br>Defendant(s). | Case No. 3:21-cv-00066-MMD-CLB<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CIRCULATION OF NOTICE PURSUANT TO 29 U.S.C. §216(b)** |

**THIERMAN BUCK LLP**
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

1  TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

2  COMES NOW Plaintiff CHRISTOPHER NELSON and all current Opt-In Plaintiffs ("Plaintiffs"), by and through their attorneys, and hereby move the Court for an Order directing that other persons similarly situated to Plaintiffs be given notice of the pendency of this action and an opportunity to file written consents with the Court to join this action as party plaintiffs pursuant to 29 U.S.C. § 216(b) of the Fair Labor Standards Act ("FLSA").

Plaintiffs Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities in support thereof, the proposed Notice of pendency of FLSA collective action lawsuit against Defendant WAL-MART ASSOCIATES, INC., and DOES 1 through 50, inclusive (attached to this motion as Exhibit "A"), the proposed Consent to Join (attached to this motion as Exhibit "B"), the Declarations filed in support of this Motion and all accompanying exhibits, pleadings, papers, and records on file herein, all matters upon which judicial notice may be taken, any oral argument that may be presented, and upon such other matters the Court deems just and necessary.

For all the reasons expressed herein, Plaintiffs respectfully request that the Court grant this Motion for Circulation of Notice of the pendency of the federal FLSA collective action.

DATED: October 22, 2021          Respectfully submitted,

**THIERMAN BUCK LLP**

/s/ *Joshua R. Hendrickson*
Joshua R. Hendrickson

*Attorney for Plaintiffs*

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Certification under the Fair Labor Standards Act ("FLSA") occurs in two stages: "First, at or around the pleading stage, plaintiffs will typically move for preliminary certification." *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109 (9th Cir. 2018). "'Preliminary certification' of an FLSA collective action—also known as 'provisional' or 'conditional' certification—[has] . . . '[t]he sole consequence' of . . . 'sending . . . court-approved written notice' to workers who may wish to join the litigation as individuals." *Id.* at 1101 (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)). Second, "at or after the close of relevant discovery[,] . . . [t]he employer can move for 'decertification' of the collective action for failure to satisfy the 'similarly situated' requirement in light of the evidence produced to that point." *Campbell*, 903 F.3d at 1109.

A court may approve preliminary certification upon a plaintiff showing that all putative collective members are "similarly situated." 29 U.S.C. § 216(b). "The level of consideration [at the preliminary stage] is 'lenient,'—sometimes articulated as requiring 'substantial allegations,' sometimes as turning on a 'reasonable basis,' but in any event loosely akin to a plausibility standard, commensurate with the stage of the proceedings." *Campbell*, 903 F.3d at 1109 (internal citations omitted). To be "similarly situated," "party plaintiffs must be alike with regard to some material aspect of their litigation . . . [such that the similarity] 'allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.'" *Id.* at 1114 (second omission in original) (emphasis omitted) (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). That is, "Party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Campbell*, 903 F.3d at 1117. Furthermore, where "the party plaintiffs' factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment." *Id.* at 1114. (emphasis omitted).

Here, Plaintiffs' Motion should be granted and notice should issue to all similarly situated employees within the **FLSA Dry Section Class** because all proposed class members were subject to a common plan, policy, and practice whereby Defendant WAL-MART ASSOCIATES, INC. ("Defendant") suffered or permitted such employees to work off-the-clock and without compensation for the time it took them to retrieve equipment required to process goods within Defendant's warehouses and proceed to their work station prior to the start of their shift. Likewise, Plaintiffs' Motion should be granted and notice should issue to all similarly situated employees within the **FLSA Cold Section Class** because all proposed class members were subject to a common plan, policy, and practice whereby Defendant suffered or permitted such employees to work off-the-clock and without compensation for the time it took them to don cold storage personal protective equipment (PPE) and proceed to their work station prior to the start of their shift.

Specifically, Defendant maintained a policy that all employees must have physical possession of all equipment, gear and required PPE supplied by Defendant and kept on-site necessary to perform their work prior to clocking in and attending a mandatory startup meeting. All employees who worked in the Dry Section had to retrieve a scanner, printer, or other electronic devices from a central location where they were being re-charged before clocking in and beginning their shift. And all employees who worked in the Cold Section had to don PPE on site before clocking in and beginning their shift.

This Motion for Circulation of Notice Pursuant to 29 U.S.C. § 216(b) is brought so that other employees of Defendant who have been the victims of Defendant's policy and practice of suffering and permitting employees to work without compensation have an opportunity to preserve their statute of limitations and participate in this action. The burden to the employer of giving employees notice is slight and the loss to the employees who fail to receive notice is great. Plaintiffs' Motion seeks the conditional certification of the following two FLSA Classes:

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

**FLSA Dry Section Class:** All non-exempt hourly paid food distribution warehouse employees who (i) were employed by Defendant in the United States at any time within 3 years from the filing of the original complaint in this action, (ii) worked in the dry section of the food distribution warehouse, and (iii) were required to retrieve a scanner, printer, or other electronic device pre-shift.

**FLSA Cold Section Class:** All non-exempt hourly paid food distribution warehouse employees who (i) were employed by Defendant in the United States at any time within 3 years from the filing of the original complaint in this action, (ii) worked in the cold section of the food distribution warehouse, and (iii) were required to don cold storage personal protective equipment (PPE) pre-shift.

## II.  PROCEDURAL HISTORY

Plaintiff CHRISTOPHER NELSON filed the original class and collective action complaint in this action in the First Judicial District Court of the State of Nevada, in and for the County of Storey, on December 23, 2020. (ECF No. 1-2.). Defendant filed its Notice of Removal on January 29, 2021 (ECF No. 1), and subsequently filed a Motion to Dismiss on March 31, 2021. (ECF No. 11). Plaintiff filed his First Amended Complaint on April 2, 2021, alleging five causes of action: (1) failure to pay overtime in violation of 29 U.S.C. § 207; (2) failure to pay minimum wages in violation of the Nevada Constitution; (3) failure to compensate for all hours worked in violation of NRS 608.140 and 608.016; (4) failure to pay overtime in violation of NRS 608.140 and 608.018; (5) failure to timely pay all wages due and owing in violation of NRS 608.140 and 608.020-.050. (ECF No. 14 (hereinafter, "FAC")). Plaintiff's allegations arise from Defendant's policies and practices of requiring Plaintiff and similarly situated employees to complete compensable work activities pre-shift without pay on

behalf of two classes of employees under the Fair Labor Standards Act ("FLSA")..[1] *See* FAC, generally. While Plaintiff filed this action as a hybrid class and collective action, this Motion only concerns the collective action claims brought by Plaintiff on behalf of himself, the three party plaintiffs who have decided to opt in to this FLSA action (collectively "Opt-In Plaintiffs"), and similarly situated potential opt-in plaintiffs who Plaintiff seeks to notify of this action through the instant Motion. (ECF Nos. 1-2, 36, 37, 40, 41).

Defendant re-filed its Motion to Dismiss Plaintiff's First Amended Complaint on April 16, 2021. (ECF No. 16). Defendant's motion is now fully briefed and pending before this Court.

This case is early in its procedural posture. Defendant has not yet propounded any written discovery or noticed any depositions. Plaintiff has propounded written discovery upon Defendant seeking information and documents relating to a variety of class and collective issues; however, to date, Defendant has completely refused to produce any class discovery and has similarly refused to provide information and documents in response to numerous requests that could have potentially proved relevant to the instant Motion. Likewise, Plaintiff has requested dates for depositions of Defendant's Persons Most Knowledgeable but has not yet been provided with potential dates by Defendant. Plaintiff hopes that these discovery disputes will be resolved through meet-and-confer efforts but anticipates that they may come before this Court at a later date. In the meantime, Defendant should not be allowed to benefit from its hiding of the proverbial ball by preventing potential opt-in plaintiffs from learning of this suit and depriving them of their opportunity to opt-in and preserve their limitations periods.

### III. COMMON FACTS

#### A. Plaintiff Nelson and the Opt-In Plaintiffs

---

[1] This is also a putative class action under Nevada state wage-hour law. Plaintiff's state law causes of action are subject to the certification requirements provided by Rule 23 the Federal Rules of Civil Procedure. It is well-established that opt-out FRCP Rule 23 class claims may be brought within the same action that alleges an opt-in collective action. *See*, *e.g.*, *Busk v. Integrity Staffing Solutions, Inc.*, 713 F.3d 525 (9th Cir. 2013). This Motion is limited only to the notification under the reduced standards of the FLSA. Plaintiff reserves his right to bring a Rule 23 class certification motion at a later time.

1. Plaintiff Nelson has been employed by Defendant as a non-exempt hourly paid warehouse worker since on or about October 1, 2007 to the present. *See* Declaration of Christopher Nelson ("Nelson Dec.") at ¶ 3; *see also* ECF No. 14 (Operative Complaint), at ¶ 7. Plaintiff Nelson has worked as a Processor in both the dry and cold sections of Defendant's warehouse in Sparks, Nevada during the relevant period. *See* Nelson Dec. at ¶ 4; *see also* Operative Complaint, at ¶¶ 13-14. Plaintiff Nelson is regularly scheduled to work ten hours a day, four days per week, for a total of 40 hours in a workweek, not including time worked off-the-clock. *See* Nelson Dec. at ¶ 5; *see also* Operative Complaint, at ¶ 15.

2. Opt-In Plaintiff Marcella Bostrom has been employed by Defendant as a non-exempt hourly paid warehouse worker since on or about October 2017 to the present. *See* Declaration of Marcella Bostrom ("Bostrom Dec.") at ¶ 3. Opt-In Plaintiff Bostrom has worked in the receiving department of the dry section and as an Order Filler in the dry section of Defendant's warehouse in Sparks, Nevada during the relevant period. *See* Bostrom Dec. at ¶ 4. Opt-In Plaintiff Bostrom is regularly scheduled to work ten hours a day, four days per workweek, for a total of 40 hours in a week, not including time worked off-the-clock. *See* Bostrom Dec. at ¶ 5.

3. Opt-In Plaintiff Donna Karsten has been employed by Defendant as a non-exempt hourly paid warehouse worker since on or about July 22, 2006 to the present. *See* Declaration of Donna Karsten ("Karsten Dec.") at ¶ 3. Opt-In Plaintiff Karsten has worked as a Hauler in the dry section and has also worked in the cold section of Defendant's warehouse in Sparks, Nevada during the relevant period. *See* Karsten Dec. at ¶¶ 4, 6. Opt-In Plaintiff Karsten is regularly scheduled to work ten hours a day, four days per week, for a total of 40 hours in a workweek, not including time worked off-the-clock. *See* Karsten Dec. at ¶ 5.

4. Opt-In Plaintiff Monica Schulze has been employed by Defendant as a non-exempt hourly paid warehouse worker since on or about April 2018 to the present. *See* Declaration of Monica Schulze ("Schulze Dec.") at ¶ 3. Opt-In Plaintiff Schulze has worked in the dry section as a Loader and has worked in the cold section as an Order Filler in Defendant's warehouse in Pageland, South Carolina during the relevant period. *See* Schulze Dec. at ¶¶ 3, 6.

Opt-In Plaintiff Schulze is regularly scheduled to work eleven hours a day, three days per week, although she sometimes works up to 40 hours or more in a workweek, not including time worked off-the-clock. *See* Schulze Dec. at ¶ 5.

### B. Common Allegations That Defendant Suffered and/or Permitted Plaintiff and Opt-In Plaintiffs to Work Without Compensation

#### i. Summary of Uncompensated Off-The-Clock Work

5. As set forth in the operative complaint and confirmed by declaration testimony, Wal-Mart's food distribution warehouses are divided into "dry" and "cold" sections. *See* Operative Complaint, at ¶ 12; *see also* Nelson Dec. at ¶ 6; Bostrom Dec. at ¶ 6; Karsten Dec. at ¶ 6; Schulze Dec. at ¶ 6. Regardless of which section of the warehouse an employee is assigned to work, all non-exempt hourly paid warehouse employees were required to have physical possession of all equipment, gear and required PPE supplied by Defendant and kept on-site necessary to perform their work prior to clocking in and attending a mandatory startup meeting. *See* Operative Complaint, at ¶ 16, 18, 22, 26, 27, 31; *see also* Nelson Dec. at ¶¶ 8-13; Bostrom Dec. at ¶¶ 8-11; Karsten Dec. at ¶¶ 8-12; Schulze Dec. at ¶¶ 8-12. All employees who worked in the Dry Section had to retrieve a scanner, printer, or other electronic devices from a central location where they were being re-charged before clocking in and beginning their shift. *See* Operative Complaint, at ¶ 12; *see also* Nelson Dec. at ¶ 9; Bostrom Dec. at ¶ 9; Karsten Dec. at ¶ 9; Schulze Dec. at ¶ 9. And all employees who worked in the Cold Section had to don PPE on site before clocking in and beginning their shift. *See* Nelson Dec. at ¶¶ 12-13; Bostrom Dec. at ¶ 11; Karsten Dec. at ¶ 11; Schulze Dec. at ¶ 11.

6. Because this work was in addition to the warehouse workers' regularly scheduled time, the employees consequently worked overtime over 40 hours in a workweek and over 80 hours in a pay period without receiving any overtime premium or compensation whatsoever for their work. *See* Nelson Dec. at ¶¶ 10; 13; Bostrom Dec. at ¶ 10; Karsten Dec. at ¶ 10; Schulze Dec. at ¶¶ 10, 12.

#### ii. Dry Section Pre-Shift Activities

7. Defendant requires Plaintiff and all other similarly situated employees to be ready to work at shift start time for work in the dry section. *See* Nelson Dec. at ¶ 8; Bostrom Dec. at ¶ 8; Karsten Dec. at ¶ 8; Schulze Dec. at ¶ 8. However, Defendant does not allow Plaintiff and all other similarly situated employees to clock-in to the timekeeping system until immediately before their scheduled shift start time. *See* Nelson Dec. at ¶ 8; Bostrom Dec. at ¶ 8; Karsten Dec. at ¶ 8; Schulze Dec. at ¶ 8.

8. In order to be ready to work at the shift start time in the dry section, Defendant requires that Plaintiff and all other similarly situated employees first retrieve whatever equipment is needed for their assignment prior to the start of their shift. *See* Nelson Dec. at ¶ 9; Bostrom Dec. at ¶ 9; Karsten Dec. at ¶ 9; Schulze Dec. at ¶ 9. For certain electronic equipment, Plaintiff and similarly situated employees scanned their employee badges at the control window to check out the equipment, thereby generating a data trail that may be used to verify and corroborate Plaintiff and Opt-In Plaintiffs' allegations concerning the performance and amount of off-the-clock work. *See* Nelson Dec. at ¶ 9; Bostrom Dec. at ¶ 9; Karsten Dec. at ¶ 9; Schulze Dec. at ¶ 9.

9. The equipment that Plaintiff and all other similarly situated employees are required to pick up at the beginning of the day is integral and indispensable to the job of a warehouse worker in the dry section of Defendant's warehouses. *See* Nelson Dec. at ¶ 9; Bostrom Dec. at ¶ 9; Karsten Dec. at ¶ 9; Schulze Dec. at ¶ 9. Plaintiff and all other similarly situated employees use this equipment throughout their workday to haul and move products as well as to inventory and label products for ultimate distribution to Wal-Mart's retail stores. *See* Nelson Dec. at ¶ 9; Bostrom Dec. at ¶ 9; Karsten Dec. at ¶ 9; Schulze Dec. at ¶ 9.

10. Despite the integral and indispensable nature of the equipment to the job of a warehouse worker in the dry section, Defendant does not compensate Plaintiff or any other similarly situated employee for the time it takes to retrieve these items before their scheduled shifts. *See* Nelson Dec. at ¶ 10; Bostrom Dec. at ¶ 10; Karsten Dec. at ¶ 10; Schulze Dec. at ¶ 10.

11. Plaintiff and Opt-In Plaintiffs estimate that warehouse workers in the dry section of the warehouse regularly retrieve their equipment approximately ten to fifteen (10-15) minutes prior to their scheduled shift so that they have sufficient time to (i) check out the equipment and (ii) proceed to their station for their start-up meeting at the start of their shift. *See* Nelson Dec. at ¶ 10; Bostrom Dec. at ¶ 10; Karsten Dec. at ¶ 10; Schulze Dec. at ¶ 10.

### iii. Cold Section Pre-Shift Activities

12. As with the dry section, Defendant also requires Plaintiff and all other similarly situated employees to be ready to work at shift start time for work in the cold section. *See* Nelson Dec. at ¶ 8; Bostrom Dec. at ¶ 8; Karsten Dec. at ¶ 8; Schulze Dec. at ¶ 8. Again, however, Defendant does not allow Plaintiff and all other similarly situated employees to clock-in to the timekeeping system until immediately before their scheduled shift start time. *See* Nelson Dec. at ¶ 8; Bostrom Dec. at ¶ 8; Karsten Dec. at ¶ 8; Schulze Dec. at ¶ 8.

13. In order to be ready to work at the shift start time in the cold section, Defendant requires that Plaintiff and all other similarly situated employees first retrieve all necessary equipment for their assigned workstation off-the-clock prior to the start of their shift, without compensation. *See* Nelson Dec. at ¶¶ 11, 13; Bostrom Dec. at ¶ 11; Karsten Dec. at ¶ 11; Schulze Dec. at ¶¶ 11, 12.

14. In order to be ready to work at the shift start time in the cold section, Defendant further required Plaintiff and all other similarly situated employees to don personal protective equipment (PPE)—i.e., freezer gear—prior to the start of their respective shifts. *See* Nelson Dec. at ¶ 12; Bostrom Dec. at ¶ 11; Karsten Dec. at ¶ 11; Schulze Dec. at ¶ 11.

15. The cold section is the freezer/refrigerator section of the food warehouse wherein freezer and refrigerated items are distributed. respective shifts. *See* Nelson Dec. at ¶ 12; Bostrom Dec. at ¶ 11; Karsten Dec. at ¶ 11; Schulze Dec. at ¶ 11. Understandably, Defendant requires all employees who work in the cold section to wear "cold store clothing" or "freezer wear" as PPE to prevent workplace illness and injury due to the cold environment. respective shifts. *See* Nelson Dec. at ¶ 12; Karsten Dec. at ¶ 12; Schulze Dec. at ¶ 11.

Therefore, Defendant requires Plaintiff and all other similarly situated employees to don the same or similar PPE prior to the start of their respective shifts:

- RefrigiWear insulated bibs;[2]
- RefrigiWear thermal jacket;
- Thermal hooded sweatshirt;
- Stocking hat; and
- Wool socks.

*See* Nelson Dec. at ¶ 12; Karsten Dec. at ¶ 12; Schulze Dec. at ¶ 11.

16. Donning this PPE is integral and indispensable to the job of a warehouse worker in the cold section of Defendant's warehouses. *See* Nelson Dec. at ¶ 12; Karsten Dec. at ¶ 12; Schulze Dec. at ¶ 11. A cold section warehouse worker cannot perform his or her job safely and/or effectively without donning this PPE. *See* Nelson Dec. at ¶ 12; Karsten Dec. at ¶ 12; Schulze Dec. at ¶ 11.

17. Despite the integral and indispensable nature of this PPE to the job of a warehouse worker in the cold section, Plaintiff and all other similarly situated employees were not compensated for the time they spent to don this PPE. *See* Nelson Dec. at ¶ 13; Bostrom Dec. at ¶ 11; Karsten Dec. at ¶ 11; Schulze Dec. at ¶ 12.

---

[2] RefrigiWear markets their PPE to cold storage employers and employees:

> Cold storage employees are dedicated to ensuring the proper care and storage of customers' products, which means a cold working environment no matter the season. RefrigiWear has spent the last 60 years helping cold storage employees stay warm and protected in the cooler and freezer while they work. We offer cold apparel like our iconic Iron-Tuff line and our stylish softshell options. We help you keep a professional look with embroidery services and stylish cooler and freezer gear that helps you master the cold. Whether it is jackets, pants, base layers, boots, or one of our many other products, RefrigiWear has the gear to keep cold storage employees protected from the cold.

*See* https://www.refrigiwear.com/view/cold-storage (last visited Dec. 2, 2020).

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

18.     Plaintiff and Opt-In Plaintiffs estimate that it regularly took warehouse workers in the cold section approximately fifteen (15) minutes prior to their scheduled shift to (i) pick up their required equipment, (ii) don their PPE and (iii) proceed to their station for their start-up meeting at the start of their shift, all of which had to be completed off-the-clock before clocking in. *See* Nelson Dec. at ¶ 13; Schulze Dec. at ¶ 12.

### iv.  Wal-Mart Knew its Warehouse Employees Were Performing Work Off-The-Clock But Failed to Either Stop or Pay for the Work.

19.     Plaintiff and all Opt-In Plaintiffs have attested that Wal-Mart was aware that its non-exempt, hourly paid warehouse workers were performing the work described above off-the-clock without compensation prior to the start of their shifts but that Wal-Mart nonetheless failed to stop the performance of the work or pay for the work. *See* Nelson Dec. at ¶ 14; Bostrom Dec. at ¶ 12; Karsten Dec. at ¶ 13; Schulze Dec. at ¶ 13.

20.     Indeed, apparently recognizing the errors of its ways, Wal-Mart has recently taken several steps to limit off-the-clock work pre-shift, including changing policies concerning where and when warehouse employees may clock in. *See* Nelson Dec. at ¶ 7; Bostrom Dec. at ¶ 7; Karsten Dec. at ¶ 7; Schulze Dec. at ¶ 7.

## IV.  LEGAL ARGUMENT

### A.  Preliminary Conditional Certification Standard

Under the FLSA, employers must pay their employees a minimum wage and overtime wages for hours worked in excess of forty (40) hours per week. *See* 29 U.S.C. § 207. If an employer fails to do so, an aggrieved employee may bring a collective action on behalf of "similarly situated" employees based on their employer's alleged violations of the FLSA. *Does I thru XXIII v. Advanced Textile Corp.,* 214 F.3d 1058, 1064 (9th Cir. 2000).

The decision as to whether to certify a collective action is within the discretion of the district court. *Adams v. Inter–Con Sec. Sys.,* 242 F.R.D. 530, 535 (N.D. Cal. 2007) (citing *Leuthold v. Destination Am., Inc.,* 224 F.R.D. 462, 466 (N.D. Cal. 2004)). Certification under the FLSA occurs in two stages. This Motion concerns the first state—preliminary certification.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

*Campbell v. City of Los Angeles*, 903 F.3d 1090, 1109 (9th Cir. 2018) ("First, at or around the pleading stage, plaintiffs will typically move for preliminary certification.").

"'Preliminary certification' of an FLSA collective action—also known as 'provisional' or 'conditional' certification—[has] . . . '[t]he sole consequence' of . . . 'sending . . . court-approved written notice' to workers who may wish to join the litigation as individuals." Id. at 1101 (quoting *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013)). A court may approve preliminary certification upon a plaintiff showing that all putative collective members are "similarly situated." 29 U.S.C. § 216(b). "The level of consideration [at the preliminary stage] is 'lenient,'—sometimes articulated as requiring 'substantial allegations,' sometimes as turning on a 'reasonable basis,' but in any event loosely akin to a plausibility standard, commensurate with the stage of the proceedings." *Campbell*, 903 F.3d at 1109 (internal citations omitted). To be "similarly situated," "party plaintiffs must be alike with regard to some material aspect of their litigation . . . [such that the similarity] 'allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources.'" *Id.* at 1114 (second omission in original) (emphasis omitted) (quoting *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989)). That is, "Party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims." *Campbell*, 903 F.3d at 1117. Furthermore, where "the party plaintiffs' factual or legal similarities are material to the resolution of their case, dissimilarities in other respects should not defeat collective treatment." *Id.* (emphasis omitted).

The reason for such a lenient standard during the notice stage is simple—the court is merely deciding whether the potential class should be notified of the pending action. *Leuthold*, 2274 F.R.D. 462 at 467. Indeed, this is a procedural motion to determine whether Notice should be sent out to absent class members so that they can decide whether to participate in this action. Only after the parties have had a full opportunity to exhaust the discovery process will the legal and factual issues be put before this Court of whether Plaintiff and the Proposed Class should be paid for alleged work they performed off-the-clock. Therefore, opt-in plaintiffs who share common issues of law and fact must be given an opportunity to participate in the action

and be bound by the result. *Id.* at 468 ("Bypassing the notice stage altogether would deprive the court of this information and might deprive some plaintiffs of a meaningful opportunity to participate.").

Here, Defendant has not yet filed an answer to Plaintiff's First Amended Complaint and discovery is in its initial stages. Defendant has provided some limited discovery with respect to the Named-Plaintiff Nelson but has not yet produced information for the Opt-In Plaintiffs and has refused to produce any data for putative collective and class action members. After Plaintiff is provided with a list of potential opt-ins, and notices are sent out, the Parties will be able to more fully explore the factual and employment situation of any opt-ins that will be appropriate for the more searching "similarly situated" requirement under the second-tier analysis following the close of discovery. *Leuthold,* 2274 F.R.D. 462 at 468 (recognizing that when relevant facts have not been fully explored the court should defer to the first-tier analysis and that "[t]he number and type of plaintiffs who choose to opt into the class may affect the court's second tier inquiry regarding the disparate factual and employment situations of the opt-in plaintiffs, as well as fairness and procedural issues."). Indeed, as adeptly noted by the *Leuthold* court, "[b]ypassing the notice stage altogether would deprive the court of this information and might deprive some plaintiffs of a meaningful opportunity to participate." *Id.*

**B.     Plaintiffs and Potential Opt-In Plaintiffs Share Issues of Fact.**

As set forth in the facts section above, Plaintiff shares similar issue of fact with potential opt-in plaintiffs that he seeks to inform about the pendency of this action for the following five (5) primary reasons. First, Plaintiff and potential opt-in plaintiffs are all non-exempt hourly paid employees who worked in Defendant's warehouses within the United States.[3] Second, Plaintiff and all potential opt-in plaintiffs in the FLSA Dry Section Class were required to retrieve a scanner, printer, or other electronic equipment off-the-clock prior to the start of their regularly scheduled shifts.[4] Third, Plaintiff and all potential opt-in plaintiffs in the

---

[3] *See* Nelson Dec. at ¶ 3; Bostrom Dec. at ¶ 3; Karsten Dec. at ¶ 3; Schulze Dec. at ¶ 3.

[4] *See* Nelson Dec. at ¶ 8; Bostrom Dec. at ¶ 8; Karsten Dec. at ¶ 8; Schulze Dec. at ¶ 8.

THIERMAN BUCK LLP
7287 Lakeside Drive
Reno, NV 89511
(775) 284-1500 Fax (775) 703-5027
Email info@thiermanbuck.com www.thiermanbuck.com

FLSA Cold Section Class were required to don cold storage personal protective equipment (PPE) off-the-clock prior to the start of their regularly scheduled shifts.[5] Fourth, Defendant maintains electronic records that may be used to verify and corroborate testimony regarding the performance and amount of off-the-clock work performed by Plaintiff and potential opt-in plaintiffs in both the FLSA Dry Section Class and the FLSA Cold Section Class.[6] And fifth, Plaintiff and all declarants contend that Defendant was aware that its non-exempt, hourly paid warehouse workers were performing the work described above off-the-clock without compensation but has continued to refuse to pay its employees for this time.[7] All of these common facts support notice being issued to potential opt-in plaintiffs.

### C. Plaintiff and Potential Opt-In Plaintiffs Share Issues of Law.

This case turns on the following dispositive question of law shared by Plaintiff and all potential opt-in plaintiffs:

> (1) **Whether Defendant suffered and/or permitted non-exempt warehouse employees to perform work without compensation.** (If the answer to this question is in the affirmative, then the subsequent question is whether Defendant failed to pay these same warehouse employees overtime compensation when they worked over forty (40) hours in a workweek.).

The common question of law presented above is common to Plaintiffs and all potential opt-in plaintiffs. Under the FLSA, an employer must compensate an employee for all work that it suffers and/or permits. *See, e.g.*, *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 285 (2d Cir. 2008) (The relevant standard is whether an employer "suffered or permitted" an employee to perform work). Once an employee demonstrates that the employer's time keeping system is not accurate, then the employee carries her burden "if [s]he proves that he has in fact performed

---

[5] *See* Nelson Dec. at ¶ 13; Bostrom Dec. at ¶ 11; Karsten Dec. at ¶ 11; Schulze Dec. at ¶ 12.

[6] Nelson Dec. at ¶¶ 9, 11; Bostrom Dec. at ¶ 9; Karsten Dec. at ¶ 9; Schulze Dec. at ¶ 9.

[7] *See* Nelson Dec. at ¶ 14; Bostrom Dec. at ¶ 12; Karsten Dec. at ¶ 13; Schulze Dec. at ¶ 13.

work for which he was improperly compensated and if [s]he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946); *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1047 (2016) (Instead of punishing "the employee by denying him any recovery on the ground that he is unable to prove the precise extent of uncompensated work," the Court held "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.") (citing *Mt. Clemmens*, 328 U.S., at 687, 66 S.Ct. 1187).

Furthermore, employees need only show that they performed work without compensation and that the employer knew, or should have known, that the uncompensated work was being performed. Indeed, it is black letter law that an employer has an affirmative duty to prevent unwanted work from being performed. "It is clear an employer's actual or imputed knowledge that an employee is working is a necessary condition to finding the employer suffers or permits that work." *Id.* at 287 (citation omitted); *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981). "An employer who has knowledge that an employee is working, and who does not desire the work be done, has a duty to make every effort to prevent its performance." *Id.* at 288 (emphasis added); *see also Forrester*, 646 F.2d at 414 ("An employer who is armed with this knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation...."); *Mumbower v. Callicott*, 526 F.2d 1183, 1188 (8th Cir.1975) ("The employer who wishes no such work to be done has a duty to see it is not performed."); 29 C.F.R. § 785.13 ("In all such cases it is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed."). Ultimately, "[t]he reason an employee continues to work beyond his shift is immaterial; if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted." *Reich v. Dep't of Conservation & Natural Res., State of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994).

Here, Plaintiff has attested that he was not compensated for all the time that he worked. Plaintiff has further demonstrated that he is similarly situated to the current Opt-In Plaintiffs, by way of sworn declarations, and thus they will be able to meet their burden that Defendants' timekeeping system has not accurately recorded all employee hours worked. Likewise, it is clear that Plaintiff, current Opt-In Plaintiffs, and potential opt-in plaintiffs will share issues of law and fact with respect to Defendant's defense of this action. For example, in its Motion to Dismiss, Defendant questions whether the alleged pre-shift activities were performed prior to clocking in and whether they may support a claim under the Fair Labor Standards Act. *See* ECF No. 16. And while Defendant has yet to answer Plaintiff's operative complaint, Plaintiff expects that Defendant will assert a variety of defenses that would apply equally to the claims of Plaintiff, Opt-In Plaintiffs, and potential opt-in plaintiffs, and which would benefit from common resolution.

### D.  The Attached Notice and Consent Adequately Inform Potential Opt-In Plaintiffs Of Their Right To Participate (Or Refrain From Participation) In This Action

A proposed Notice of Pendency of FLSA Collective Action Lawsuit is attached to this Motion as Exhibit "A." A proposed Consent to Join is attached as Exhibit "B." The Notice neutrally describes the lawsuit, Plaintiff's claims, and Defendant's anticipated defenses. *See* Exhibit A, at pp. 2-3. The Notice identifies who may participate in the action, that participation is completely voluntary, and that if the party decides to participate, he or she will be bound by the decision of the court, whether it is favorable or unfavorable. *See* Exhibit A, at pp. 4 ("You do not have to join this lawsuit."); Exhibit, A, at p. 3 ("To participate in this lawsuit, you must have been employed by Wal-Mart at any time from December 23, 2017, to the present as a non-exempt hourly paid food distribution warehouse employee . . ."); Exhibit A, at p. 3 ("If you choose to join this case, you will be bound by the decision of the court, whether it is favorable or unfavorable."). Accordingly, Plaintiff respectfully requests that the proposed Notice and Consent to Join be approved and that the Court authorize the proposed Notice and Consent to

Join be distributed via United States Mail and electronically to the putative FLSA collective groups.

## V.  CONCLUSION

For all the foregoing reasons, Plaintiff respectfully submits that his Motion for Circulation of Notice Pursuant to 29 U.S.C. §216(b) be granted and Notice should issue to potential opt-in plaintiffs as soon as practicable.

DATED: October 22, 2021         Respectfully Submitted,

**THIERMAN BUCK LLP**

/s/*Joshua D. Buck*
Mark R. Thierman
Joshua D. Buck
Leah L. Jones
Joshua R. Hendrickson

*Attorneys for Plaintiffs*

### Index of Exhibits

A. Proposed Notice

B. Proposed Consent to Join

# CERTIFICATE OF SERVICE

I hereby certify that I am an employee of Thierman Buck Law Firm, on this 22nd day of October 2021 I served a true and correct copy of the forgoing **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CIRCULATION OF NOTICE PURSUANT TO 29 U.S.C. §216(b)** to the Clerk's office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing of to the following CM/ECF registrants:

Anthony L. Martin
Nevada Bar No. 8177
Dana B. Salmonson
Nevada Bar No. 11180
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Wells Fargo Tower
Suite 1500
3800 Howard Hughes Parkway
Las Vegas, NV 89169
Telephone: 702.369.6800
Fax: 702.369.6888
*Attorneys for Defendant Wal-Mart Associates, Inc.*

          */s/ Jennifer Edison-Strekal*
          An employee of Thierman Buck Law Firm

- 1 -