Anthony L. Martin
Nevada Bar No. 8177
anthony.martin@ogletreedeakins.com
Dana B. Salmonson
Nevada Bar No. 11180
dana.salmonson@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV  89135
Telephone:  702.369.6800
Fax:  702.369.6888

*Attorneys for Defendant Wal-Mart Associates, Inc.*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| CHRISTOPHER NELSON, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>WAL-MART ASSOCIATES, INC. and DOES 1 through 50, inclusive,<br><br>Defendant(s). | Case No.:  3:21-cv-00066-MMD-CLB<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CIRCULATION OF NOTICE PURSUANT TO 29 U.S.C. § 216(b)** |

Defendant Wal-Mart Associates, Inc. ("Walmart" or "Defendant"), by and through undersigned counsel, hereby submits its Opposition to Plaintiffs' Notice of Motion and Motion for Circulation of Notice Pursuant to 29 U.S.C. § 216(b) ("Motion").  (ECF No. 37.)

This Opposition is based on the records, pleadings, and papers on file herein, together with the following Memorandum of Points and Authorities, the Declarations, and exhibits attached thereto, of: Rick Burns ("Burns Dec."), attached hereto as **Exhibit A** ("Ex. A"); Mark Carpenter ("Carpenter Dec."), attached hereto as **Exhibit B** ("Ex. B"); Michael Dougan ("Dougan Dec."), attached hereto as **Exhibit C** ("Ex. C"); Patricio Hudson ("Hudson Dec."), attached hereto as **Exhibit D** ("Ex. D"); Darrell Kirkley ("Kirkley Dec."), attached hereto as **Exhibit E** ("Ex. E"); Cory Peer ("Peer Dec."), attached hereto as **Exhibit F** ("Ex. F"); Shawn Petersen ("Petersen Dec."), attached hereto as **Exhibit G** ("Ex. G"); Stephen Sherbo ("Sherbo Dec."), attached hereto as **Exhibit**

1

**H** ("Ex. H"); Denise Yudovitz ("Yudovitz Dec."), attached hereto as **Exhibit I** ("Ex. I")[1]; and any such further argument as the Court may deem appropriate.

DATED this 16th day of June, 2022.

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**

*/s/ Anthony L. Martin*
Anthony L. Martin
Nevada Bar No. 8177
Dana B. Salmonson
Nevada Bar No. 11180
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV 89135
*Attorneys for Defendant Wal-Mart Associates, Inc.*

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs Christopher Nelson ("Nelson" or "Plaintiff"), and Opt-in Plaintiffs Marcella Bostrom ("Bostrom"), Donna Karsten ("Karsten"), and Monica Schulze ("Schulze") (collectively "Plaintiffs") claim that they violated Walmart's policy against working off the clock. Plaintiffs claim that they also violated Walmart's policy requiring submission of a time adjustment for time worked off the clock. Plaintiffs now ask the Court for leave to circulate notice under the Fair Labor Standards Act ("FLSA") on a nation-wide basis based on nothing more than a cookie-cutter narrative that does not comport with reality. At the core of Plaintiffs' narrative is their sweeping and wholly unsupportable allegation that all Grocery Distribution Center ("GDC") warehouse associates, regardless of GDC location or position, are required to have physical possession of all personal electronic equipment and personal protective equipment ("PPE") prior to clocking in.

With this, they seek to circulate notice for two proposed classes, a "Dry Section" of associates required to obtain electronic equipment pre-shift and a "Cold Section" of associates required to don PPE (freezer gear) pre-shift – all of whom Plaintiffs allege violated Walmart's policy against

---

[1] Exhibits A, F, G, and I include exhibits and/or portions of exhibits subject to Defendant's Motion to File Exhibits Under Seal, filed concurrently herewith pursuant to Local Rule IA 10-5(a).

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. CHARLESTON BLVD.
SUITE 500
LAS VEGAS, NV 89135
TELEPHONE: 702.369.6800

working off the clock and Walmart's policy requiring submission of a time adjustment for time worked off the clock.

Plaintiffs' generic allegation of a widespread policy subjecting them to off-the-clock work is simply not true. No such policy or practice exists. Walmart's actual policies emphasize its commitment to paying associates for all hours worked, strictly and expressly prohibiting off-the-clock work. Further, the Plaintiffs attribute any supposed instance of working off-the-clock to *different* circumstances. The three Plaintiffs who work in McCarran, Nevada, blame a unique and limited requirement at that one facility that, for a defined period of time, in two specific dry receiving positions, they were required to use a particular time clock. The Plaintiff who works in Pageland, South Carolina, obviously, could in no way be impacted by this limited McCarran, Nevada circumstance. Indeed, she specifically declares that Walmart's policies are of no impact on her personal decision to disregard those policies. What the Pageland, South Carolina Plaintiff neglects to acknowledge is that her actions in obtaining equipment while filling in for an Order Filler position are *different* from the process in place for associates actually assigned to that position in Pageland, South Carolina. Further, support for the alleged requirement that she, or any other associate on the perishable side, must don PPE prior to clocking-in, is non-existent. In fact, Walmart does not require GDC associates working on the perishable side of the facility to wear any specific piece of PPE, let alone put it on before clocking in.

The truth is this: GDC associates are expected to timely clock in and attend their shift start-up meeting. That is it. A start-up meeting includes a stretching routine, along with general and/or shift-particular announcements. Electronic equipment and/or PPE is not necessary and certainly is not required. Associates are expected to retrieve any necessary equipment, which is mostly available within steps of their designated start-up location, *after* clocking in. Equipment needs vary from position to position and the processes for distributing equipment vary among the GDCs, as demonstrated by the differences in just the two GDCs at issue here. Some positions require no electronic equipment and some positions perform multiple functions, one of which may require a handheld device, the other of which may not. What is more, depending on position and GDC, electronic equipment may have already been scanned out to associates *hours* before their scheduled

shift and placed in bins that are within steps of time clocks and designated start-up locations.  The evidence supports this actual practice, ***not*** the phantom practice of daily-required, off-the-clock, pre-shift trips to scan a badge and receive equipment, as Plaintiffs allege.

In these circumstances, Plaintiffs cannot meet their burden of demonstrating that they, and others, are "similarly situated" under the FLSA, 29 U.S.C. § 201, *et seq*.  As such, Plaintiffs' Motion must be denied.

## II.   RELEVANT FACTS

### A.   GDC Facilities Vary

Walmart's grocery supply chain network includes forty-four (44) GDC warehouse facilities, which vary based on operations type, commodities serviced, and perishable operation characteristics. (Ex. D at ¶¶ 4-6.)  Some GDCs run only perishable operations, while thirty-five (35) "Full" GDCs maintain operations for both dry (ambient) and perishable product.  (*Id.*, ¶¶ 7-8.)  "Single dock" facilities use one dock for perishable shipping and receiving purposes, while "2-dock" facilities have separate docks for each operation.[2]  (*Id.* ¶ 9.)  A small number of GDCs have an additional dry dock, typically used for shipping purposes, and referred to as the "shipping wing".  (*Id.* ¶ 16.)

The GDC located in McCarran, Nevada ("McCarran GDC") is a "Full 2-dock T" facility with equal sized shipping and receiving docks on either side of the perishable operations and a T-shaped freezer at the end.  (*Id.*, ¶ 14.)  It has a "shipping wing" on its dry operations side.  (*Id.*, ¶¶ 16, 17.) The GDC located in Pageland, South Carolina ("Pageland GDC") is a Full single dock facility with a small freezer protrusion at the end.  (*Id.*, ¶ 15.)  It does not have a "shipping wing".  (*Id.*, ¶17.)

### B.   Walmart's Actual Policies And Practices

#### 1.   Walmart Prohibits Off-the-Clock Work And Requires Accurate Timekeeping Practices

Walmart maintains policies that are not only FLSA-compliant, but demonstrate their commitment to paying for ***all*** time worked, including overtime.  Defendant's Associate Pay Policy ("Pay Policy") states, in part:

---

[2] There are also "Outliers" "Mechanized" and "2-dock I" perishable facilities that vary in dock size, product capacity, and operation functions.  (Ex. D at ¶¶10-13.)

4

**Prohibition against working off the clock**

***Off the clock work*** means any work performed when a non-exempt associate's time was not recorded, either manually or by an electronic timekeeping device which resulted in the associate not being paid for the time worked.  If you perform work while not clocked in, you must keep track of all time worked and immediately submit an appropriate time adjustment for that time.

You are not allowed to volunteer your time.  No one may ask you to volunteer your time and you will be paid for all work time including overtime.

If a supervisor or manager requests, requires or allows you to work without compensation please report it to the Wage and Hour helpline or ethics hotline.

(Ex. A-1 at WM-NELSON0000747-748.)  The Pay Policy further describes off-the-clock work to include performing any work prior to clocking in.  (*Id.*)  Moreover, the Pay Policy reinforces Defendant's commitment to paying for overtime hours worked, as evidenced by the following:

Accurately reporting and recording all hours you work for the date you performed the work, indicating actual start and stop times and including meal periods is vital so that we can properly pay you everything that you have earned.  You must report all hours you work by the end of the next scheduled shift.  We will credit you with all of your work hours for the date you performed the work, including any and all applicable overtime.

(*Id.* at WM-NELSON0000747.)  "Failing to report or correct time records that [an associate] knows to be false, are also prohibited."  (*Id.*)

Defendant's policies also require accurate timekeeping records by stating that Defendant is "committed to paying all associates correctly, to maintaining accurate payroll records and to compensating every associate for all work performed."  (*Id.*)  If for some reason an associate performs work while they are not clocked in, they are to keep track of that time and immediately submit the appropriate time adjustment form for that time.  (*Id.*)  If associates are asked to work off-the-clock, which is strictly prohibited, or are aware of others working off-the-clock and/or deviating from Defendant's associate pay practices, they are asked to immediately contact their supervisor, People Partner, or the Wage and Hour Helpline.  (*Id.* at WM-NELSON0000748.)

Management guidelines in support of the Pay Policy ("Guidelines") reaffirm all of these timekeeping expectations, instructing managers that associates must be paid for all time worked, including all overtime.  (Ex. A-2.)  The Guidelines specify, "[s]upervisors and managers are not permitted to request, require or allow associates to work off the clock without compensation or adjust

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV 89135
Telephone: 702.369.6800

the time so that the associate is not properly compensated for all time worked." (*Id.* at WM-NELSON0000750.)  Allowing associates to work off the clock is, again, strictly prohibited and managers are instructed to take corrective action if they have knowledge of an associate working off the clock and report any suspicion of such activity to the Wage and Hour helpline.  (*Id.* at WM-NELSON0000751.)  Managers or supervisors who "request, require, or permit hourly associates to work off the clock" or "fail to take appropriate corrective action when they know an associate performs work without being paid" are subject to disciplinary action, up to and including termination. (*Id.*)

### 2. Attendance And Punctuality Requirements

Walmart's Attendance and Punctuality Policy ("Punctuality Policy") allows GDC associates to clock-in five minutes before and five minutes after shift start time without incurring an attendance occurrence.  (Ex. A-3 at WM-NELSON0000668.)  This expanded window was put in place in May 2021 in an effort to limit attendance occurrences affecting GDC associate time and attendance.  (Ex. I-1.)  The change was wholly unrelated to this lawsuit.  (*Id.*)

Previously, the clock-in window was two minutes before shift start time.  (Ex. G at ¶ 5; Ex. G-1 at WMNELSON0000685.)  This two-minute window was put in place in early 2018 to support the goal of beginning start-up meetings at shift start time, or as close thereto as possible.  (*Id.*)  The goal to align start-up meeting with shift start time was identified as part of the First Hour Productivity Improvement initiative ("FHP initiative"), the objective of which was to increase first hour productivity as compared to second hour.  (Ex. G at ¶¶ 3, 5; Ex. G-1 at WM-NELSON0000681.)  The FHP initiative Playbook ("Playbook"), "designed to be used as a ***Do-It-Yourself (DIY) tool***" for the individual GDCs to implement changes to support the FHP initiative in a manner that "***makes sense for [the individual] building***", anticipated that any change to clock-in procedures must maintain the prohibition against off-the-clock work.  (Ex. G-1 at WM-NELSON0000677.) (emphasis added.)  Specifically, "[a]ssociates come ready to do [shift start-up] meeting, ***then get equipment and start working***".  (*Id.* at WM-NELSON0000688.) (emphasis added.)  This is reiterated when considering first hour efficiencies, such that "time to get scanning equipment" is considered ***after*** the length of the start-up meeting.  (*Id.* at WM_NELSON0000716-717.)  (emphasis added.)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. CHARLESTON BLVD.
SUITE 500
LAS VEGAS, NV 89135
TELEPHONE: 702.350.6900

### 3. GDC Warehouse Shifts Begin With A Start-Up Meeting

Plaintiffs correctly identify one fact:  after clocking-in, GDC associates begin their shift with a start-up meeting.  (*See* Ex. I at ¶ 4; Ex. E at ¶ 10.)  Start-up meetings include a stretching routine while managers make necessary announcements.  (*Id.*)  Electronic equipment is of no use at the meetings, it is not necessary or required.  (Ex. I at ¶ 5; Ex. E at ¶ 10.)  Nor are associates required to don PPE prior thereto.  (Ex. I at ¶ 6; Ex. H at ¶ 7.)  All start-up meetings occur in close proximity to time clocks, with the majority of meetings taking place in the initial part of the warehouse, generally known as the "staging area".  (Ex. I at ¶ 7; Ex. E at ¶ 11.)  Within steps of one another in and around the staging area are time clocks, lockers, parked Material Handling Equipment ("MHE") and, shortly before shift start, a rack of bins with pre-assigned personal equipment for some positions.  (Ex. I at ¶ 8; Ex. E at ¶ 8.)

### 4. Electronic Equipment Needs Are Position And Function-Specific

QA Systems is responsible for maintaining, assigning and collecting the personal electronic equipment (collectively referred to as "Systems Assets") used by GDC associates. (Ex. F at ¶ 4; Ex. E at ¶ 4.)   The QA Systems office is inside the entrance to the facility, in an office area known as "Area 100".  (Ex. F at ¶ 7; Ex. E at ¶ 7.)  A QA Systems Window ("Systems Window") opens from the office into the warehouse, within steps of the staging area.  (*Id.*)  What Systems Asset is required of each GDC associate is position and position function specific.  (Ex. F at ¶¶ 8-10; Ex. E at ¶¶ 8, 10.) Advances in technology also determine the type of Systems Asset available.  For example, dry receiving computing and printing equipment attached to receiving pushcarts at the McCarran GDC have evolved to handheld devices for placement in a secured body strap.  (Ex. F at ¶ 10.)

### 5. Freezer Gear Is Available To Perishable Side Associates, But Is Not Required Outside Of The Freezer

The perishable side of the GDC facilities have temperature-controlled chambers corresponding to particular product.  (Ex. D at ¶ 19.)  Chamber temperatures, range from 54 degrees Fahrenheit for dry produce; 34 degrees for wet and cold produce and dairy/deli; 29.5 degrees for meat; minus 10 degrees for freezer; and minus 20 degrees for ice cream.  (*Id* at ¶ 19.)  The docks are maintained at 34 degrees.  (*Id.*)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV 89135
Telephone: 702.369.6800

Cold gear or PPE, including jackets and bibs, is available for all perishable side associates; however, associates are not required to wear any particular gear and may choose to wear their personal items.  (Ex. H at ¶ 4; Ex. C at ¶ 4.)  Personal items may be something as simple as a sweatshirt depending on preference, function, and primary work area within the perishable facility.  (*Id.*)  Perishable side start-up meetings generally take place around the warehouse staging area and/or the initial part of the perishable side of the facility, where the temperature is 54 degrees Fahrenheit.  (Ex. H at ¶ 6; Ex. C at ¶ 6.)  Some may even take place inside Area 100.  (Ex. F at ¶ 12.)  This was the case for Nelson from August 18, 2018 until February 15, 2019, when he was in the QA Inventory Control position, which performs quality control checks on perishable product.  (*Id.;* Ex. A at ¶ 7.)

No start-up meetings take place in the freezer chambers, the ***only*** section of the warehouse where associates are required to have on gear appropriate for the cold temperatures.  (Ex. H at ¶¶ 5, 7; Ex. C at ¶¶ 5, 7.)  The freezer gear may be Walmart issued or personal.  (*Id.*)  PPE provided by Walmart, such as bibs and freezer gloves, is assigned and stored in associate lockers, which are in close proximity to time clocks and start-up meeting locations.  (Ex. H at ¶ 8; Ex. C at ¶ 8.)

### C.    Dry Operations At The McCarran GDC Are Unique

Dry operations at the McCarran GDC are not typical, nor similar to the Pageland or any other GDC.  (Ex. D at ¶18.)  Instead, the operations are flipped, with receiving on the right side of the facility, utilizing the "shipping wing" for receiving purposes, and shipping on the left, or interior.  (*Id.*)  It is the ***only*** GDC with this configuration.  (*Id.*)  This uniquely places the receiving dock, which is the primary work area for dry receiving associates (Processors and Haulers), at a short distance across the warehouse from the staging area.  (Carpenter Dec., Ex. B at ¶ 4.)

#### 1.    The McCarran GDC Has A Time Clock On Its Uniquely Positioned Dry Receiving Dock

In addition to the goal of aligning start-up meetings as close to shift start time as possible, the 2018 FHP initiative suggested additional opportunities for GDCs to consider in support of a successful first hour.  (Ex. G at ¶ 4.)  The Playbook identified the locations of time clocks, start-up meetings, and equipment as possible opportunities, with the goal of identifying locations for each "based on ***unique*** aspects of [each GDC] building format and operations" that would allow them to

8

be as close together as possible.  (*Id.,* Ex. G-1 at WM-NELSON0000691.) (emphasis added.)   In support of the initiative, a time clock was relocated to the uniquely positioned receiving dock at the McCarran GDC by McCarran GDC management so that dry receiving associates were able to clock in there, placing them on the dock ready for the start-up meeting to begin at shift start time.  (Ex. G at ¶ 7.)  Initially, the electronic equipment used by the dry receiving associates was available on the receiving dock.  (*Id.* at ¶ 8.)  This location evolved to address other inefficiencies associated with obtaining MHE, technology advancements of the electronic equipment itself, and shift needs, eventually resulting in the electronic equipment for dry receiving associates being available for retrieval in individualized bins outside of the Systems Window.  (*See Id.*; Ex. B at ¶¶ 4-7; Ex. F at ¶ 9.)

### 2.    The McCarran GDC Plaintiffs Are Dry Receiving Associates

Dry receiving operations at the McCarran GDC run on day shifts only.  (Ex. I at ¶ 11.)   The A1 shift is the weekday day shift, with associates scheduled ten hours per day Monday through Thursday.  (*Id.* at ¶¶ 10-11.)  The B1 shift is the weekend day shift, with associates scheduled eleven hours per day Friday through Sunday.  (*Id.*)  There are currently twelve Processor associates on each of the two dry receiving shifts.  (*Id.* at ¶ 12.)  There are eight Haulers on the A1 shift and nine on the B1 shift.  (*Id.*)  All dry receiving associates at the McCarran GDC are expected to clock-in before retrieving any personal electronic equipment.  (Ex. B at ¶ 8.)

Plaintiff Nelson is currently a dry side "Processor" on the A1 shift at the McCarran GDC.[3] (ECF No. 14, pp. 4, 6.; ECF No. 37-3, ¶¶ 3-5.)  The Processor position performs two functions, unloading and receiving, and the Processor associates are designated Unloaders or Receivers.  (Ex. B at ¶ 5.)  Unloading includes taking pallets off the trucks, placing them on the receiving dock, and breaking them down by product.  (*Id.*)  When unloading, a Processor operates a piece of MHE and

---

[3] The original Complaint in this matter was filed on December 23, 2020.  (ECF No. 1-2.)  The applicable statute of limitations runs from this date, commencing December 23, 2018.  *See* 29 U.S.C. § 255(a).  Nelson has been in his current position since August 29, 2020.  (Ex. A at ¶ 7.)  Prior to that, from August 18, 2018 until February 15, 2019, he was a Quality Assurance Inventory Control associate and from February 16, 2019 until August 28, 2020, he was a Dairy/Deli receiving associate. (*Id.*)

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. CHARLESTON BLVD.
SUITE 500
LAS VEGAS, NV 89135
TELEPHONE: 702.369.6800

*does not require any personal electronic equipment*.  (*Id.*)  The receiving function includes identifying the received product and printing a pallet tag for placement on the product pallet, which designates it ready for pickup by a Hauler.  (*Id.*)  This receiving function requires use of a computer and printing device.  (*Id.*)  On each of the two dry receiving shifts at the McCarran GDC, only *three* Processors, one of whom is Nelson, are assigned the Receiver function.  (*Id.* at ¶ 7.)  The remaining nine Processors are designated Unloaders *and do not require use of any personal electronic equipment*.  (*Id.*)

Opt-in Plaintiff Karsten also works on the dry receiving A1 shift at the McCarran GDC.[4]  She is a Hauler, responsible for hauling the received pallets from the dry receiving dock to an appropriate location on the warehouse floor, ready for put away by Lift Drivers. (Ex. B at ¶ 7.)  She operates a pallet jack ("PE" or "PC") and uses a handheld scan gun for reading pallet tags.  (*Id.*)  Plaintiff Bostrom was also a Hauler on the A1 shift at the McCarran GDC until March 26, 2022.[5]

**D.    Personal Electronic Equipment is Pre-Assigned To Associates and Placed In An Individual Bin For Retrieval After Clocking In**

**1.    The McCarran GDC Pre-Assigns Equipment For All Positions**

Since before 2018, the McCarran GDC has used a pre-assignment system for warehouse associates to retrieve personal electronic equipment.  (Ex. F at ¶ 8.)  A QA Systems associate pre-assigns the equipment by scanning a bar code identifying the individual associate and the pieces of equipment needed, and then places the equipment in an individual bin.  (*Id.*)  A magnetized strip with bar codes identifying the individual associates on the shift roster for particular positions is placed on a cart, aligning with the individual plastic bins.  (*Id.*)  Shortly before shift start, the equipment cart is placed in the staging area, within steps of time clocks and start-up meetings.  (*Id.*)

---

[4] Karsten and Bostrom have never held a position on the perishable side of the facility.  (ECF Nos. 37-4, ¶ 11; 37-5, ¶ 6.)  Karsten has been a Hauler since October 29, 2016.  (Ex. A at ¶ 10.)

[5] Bostrom was hired as an Order Filler at the McCarran GDC on October 15, 2017 and remained in that position until August 17, 2018.  (Ex. A at ¶ 11.)   She was a dry Processor for approximately one year from August 18, 2018 until August 30, 2019 when she moved to the Hauler position. (*Id.*) She worked as an Appointment Clerk from September 12, 2020 until July 21, 2021 at which time she returned to the Hauler position where she remained until her recent transfer.  (*Id.*)

This process was originally put in place for Order Fillers, and, after the FHP initiative, expanded to other warehouse positions, including dry receiving Processors and Haulers.  (*Id.*, ¶ 9.)  The pre-assigned equipment cart for the dry receiving associates at the McCarran GDC is placed near the Systems Window, allowing for associate retrieval.  (*Id.*)

With this pre-assignment process in place, reports of Systems Assets scans ("BMAT reports") reflect the opposite of Plaintiffs' allegation that they are required to scan their badge at the Systems Window pre-shift.  (*See* ECF Nos. 37-3, ¶ 9; 37-4, ¶ 9; 37-5, ¶ 9.) Rather, it reflects a QA associate pre-assigning the equipment.  (Ex. F at ¶ 5; Ex. E at ¶ 5.)  For example, Nelson alleges that the pay period from October 10, 2020 to October 23, 2020, consisting of eight working days, is supportive of Plaintiffs' position that they were required to go to the Systems Window every shift 15 minutes before clocking-in to swipe their badge and retrieve equipment.  (ECF No. 14 at ¶ 23.) The BMAT report demonstrates that on seven of those days (October 14, 15, 16, 20, 21, 22, and 23, 2020), Systems Assets were assigned to Nelson ***hours before*** his shift start time, indicating that the items were pre-assigned and placed in a bin available for his retrieval after clocking in.  (Ex. F at ¶ 13.)  The ***only*** exception was on October 13, 2020, when equipment was assigned to Nelson eleven minutes ***after*** his shift start time.  (*Id.*)  That same day, he clocked-in two minutes prior to shift start. (Ex. A at ¶ 9.)   This demonstrates that he retrieved those items from the Systems Window ***after*** clocking in and attending his start-up meeting.  (*Id.*; Ex. F at ¶ 13.)  Also, approximately one month before this pay period that Nelson alleges supportive of his claims, he submitted a Time Adjustment Form recording time worked after clocking out for helping perishable receiving, indicating his awareness of what to do if he performed any work off the clock.  (Ex. A at ¶ 8.)

The BMAT report regarding Karsten is similarly telling: equipment was assigned ***hours before*** she clocked-in on each of those eight days in the exemplar pay period. (Ex. F at ¶ 14.)  During that time, Bostrom was an Appointments Clerk and did not require any personal electronic equipment, as accurately represented by the lack of *any* being assigned to her.  (*Id. at* ¶ 15; Ex. A at ¶ 11.)  For comparative reference, a year later, during October 12-15 and 19-22, 2021, when she was in the Hauler position, the BMAT report confirms that systems assets were assigned, again, ***hours before*** Bostrom clocked-in.  (Ex. F at ¶ 15.)

### 2.    The Pageland GDC Pre-Assigns Equipment For Order Fillers

The Pageland GDC began using the equipment pre-assignment process for Order Fillers in response to the FHP initiative.  (Ex. E at ¶ 8.)  Given its configuration with dry receiving on the left side of the facility, the receiving dock area where dry receiving associates have their start-up meeting is just steps beyond the staging area.  (*Id.* at ¶ 11.)  An associate passes numerous time clocks in Pageland GDC's Area 100 and staging area on the way to this location.  (*Id.*)  With the equipment pre-assignment process in place, Order Fillers retrieve electronic equipment from pre-assigned bins placed in close proximity to time clocks and start up meetings in the staging area.  (*Id.*, ¶ 8.)  Plaintiff Schulze is not an Order Filler, but occasionally picks up a shift covering that position on the dry side.  (ECF No. 37-6.)  Because she is not on the roster for the position, she will not have a pre-assigned bin and will need to retrieve equipment from the Systems Window.  (Ex. E at ¶ 9.)  She is expected to retrieve the equipment after clocking-in.  (*Id.* at ¶ 8.)

### E.    Plaintiffs Attribute The Alleged Requirement To Obtain Equipment Before Clocking-In To *Different* Circumstances

#### 1.    The McCarran GDC Plaintiffs Attribute Alleged Pre-Shift Activities To The Unique Location Of The Receiving Dock

Significantly, Plaintiffs Nelson, Bostrom, and Karsten specify that their attestations regarding the supposed requirement to obtain equipment prior to clocking-in ***pre-date*** June/July 2021.  (ECF Nos. 37-3; ¶ 7; 37-4 ¶ 7; 37-5 ¶ 7.)  They attest that, at that time, Defendant changed "its policies and practices and began instructing ***some*** employees, including me, to begin clocking in at the front of the warehouse as opposed to our assigned stations, which had previously been the requirement."  (*Id.*) (emphasis added)  While they mistakenly attribute this change to being in response to this lawsuit, they concede that it alleviated their supposed need to perform the alleged off-the-clock work that they describe.  (ECF Nos. 37-3; ¶ 7; 37-4 ¶ 7; 37-5 ¶ 7.)

#### 2.    Schulze *Cannot* Claim To Be Subjected To The Same Requirement

Plaintiff Schulze makes no mention, nor could she or any other GDC associate outside of the McCarran GDC dry receiving associates, of a change regarding which time clock she was required to use as creating, or impacting, her alleged need to retrieve equipment or to don PPE before clocking in.  (ECF No. 37-6.)  Unlike the other Plaintiffs, Schulze ***does not*** limit her attestations of supposed

12

required pre-shift activities to before June/July 2021. (*Id.*) Further, while she mistakenly claims it to have been in response to this lawsuit, she acknowledges that Walmart changed its clock-in procedures to allow associates to clock in up to five, instead of two, minutes early. (*Id.* at ¶ 7.) She maintains, however, that this expanded clock-in period was of no effect to her off-the-clock activities. (*Id.*)

Schulze's regular position at the Pageland GDC is perishable side Loader on the weekend day shift ("S4"), working three days a week and regularly scheduled less than forty hours.[6] (ECF No. 37-6.) Schulze's start-up meeting takes place just beyond the double doors from the breakroom that lead to the perishable side of the facility, where it is 54 degrees Fahrenheit. (Ex. H at ¶ 6.) She passes numerous time clocks on the way to this location. (*Id.*)

## III.   LEGAL ANALYSIS

### A.   Legal Standard

The FLSA does not expressly provide for the distribution of judicially approved notice to putative plaintiffs. *See* 29 U.S.C. § 216(b). Instead, according to the Supreme Court, collective actions should only be employed when "common issues of law and fact arising from the same alleged . . . activity" promote efficiency and judicial economy. *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). In other words, "conditional certification at the first stage is by no means automatic."[7] *Colson v. Avent, Inc.*, 2010 WL 339047, at *10 (D. Ariz. Jan. 27, 2010) (*citing Adams v. School Board of Hanover County*, 2008 WL 5070454 (E.D. Va. Nov. 26, 2008)). *See also Fetrow-Fix v. Harrah's Entertainment, Inc.*, 2011 WL 6938594, at *5 (D. Nev. Dec. 30, 2011) ("The FLSA does not require certification of collective actions."). Indeed, automatic preliminary class certification is at odds with the Supreme Court's recommendation to "ascertain the contours of the

---

[6] The Loader position fulfills two shipping functions, loading and wrapping, and operates a single jack PE. (Ex. H at ¶ 3.) Assignment to loading or wrapping is rotated. (*Id.*) Only one function, loading, requires use of a scan gun, which is generally mounted or in a holder on the PE. (*Id.*) Schulze confirms this, attesting that the equipment she operates has an "on board computer screen and scanning gun." (ECF No. 37-6, ¶ 11.) Schulze's BMAT report for the same pay period identified above confirms this, reflecting that no electronic equipment was assigned to her that pay period. (Ex. E at ¶ 12.) Plaintiffs' proposed "Cold Section" class is based only on the alleged requirement to don PPE pre-shift. (ECF No. 37, p. 3.)

[7] Despite the common use of the term "certification", § 216(b) does not use that term.

[216(b)] action at the outset." *Hoffman-La Roche Inc.*, 493 U.S. at 172.  Stated another way, "the district court cannot function as a rubber stamp for any and all claims that come its way under the statute." *Colson*, 687 F. Supp. 2d at 929-30.  To proceed collectively,[8] Plaintiffs must show they are "similarly situated" to the employees to whom they seek to send notice to.  29 U.S.C. § 216(b) ("An action . . . may be maintained against any employer . . . by any one or more employees for and on behalf of himself or themselves and other employees similarly situated."); *see also Doe v. Advanced Textile Corp.,* 214 F.3d 1058, 1064 (9th Cir. 2000).

"There is no established definition of the FLSA's 'similarly situated' requirement, nor is there an established test for enforcing it." *Senne v. Kansas City Royals Baseball Corp.,* 934 F.3d 918, 947 (9th Cir. 2022) (*quoting Campbell v. City of Los Angeles,* 903 F.3d 1090, 1111 (9th Cir. 2018)) (internal citations omitted). "[P]arty plaintiffs are similarly situated and may proceed in a collective, ***to the extent they share similar issues of law or fact material to the disposition of their FLSA claims***."  *Campbell,* 903 F.3d at 1117 (emphasis added.)  "What matters is not just any similarity between party plaintiffs, but a legal or factual similarity material to the resolution of the party plaintiff's claims, in the sense of having the potential to advance these claims, collectively, to some resolution." *Id.* at 1109.

### B.    Plaintiffs And The Proposed Collective Action Members Are Not Similarly Situated; Plaintiffs Are Not Even Similarly Situated Amongst Themselves

There is no evidence that Plaintiffs here are similarly situated among themselves, let alone nationwide classes of all dry side and all perishable side GDC associates.  Rather, the evidence demonstrates that the equipment needs of each Plaintiff, and any proposed dry class member, is variable depending on position, function within position, and GDC.  For example, a dry Processor at the McCarran GDC may not need ***any equipment whatsoever*** if assigned the unloading function of the position.  (*See* Ex. B at ¶ 4; Ex. F at ¶¶ 9-10.)  If, like Plaintiff Nelson, a processer acts as a Receiver, the required equipment for the receiving function is pre-assigned and available to him in

---

[8]  A FLSA collective action is not a representative action on behalf of an absent class; instead, § 216(b) provides a mechanism for others to join the existing lawsuit as party plaintiffs. *Fetrow-Fix*, 2011WL6938594, at *5.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV 89135
Telephone: 702.369.6800

a pre-labeled bin.  (*Id.*)  This pre-assigned bin process is not in place for Processors at the Pageland GDC, but it is in place at both GDCs for Order Fillers, with the exception of those who are not actually Order Fillers, but may be filling the position, (*see Id.;* Ex. E at ¶¶ 8-9),  Like Schulze.  Similarly, with respect to freezer gear PPE, which is only necessary in the freezer section of the warehouse (where not all perishable side associates work and where absolutely no start-up meetings take place).  Nelson's start-up meetings for his perishable side position at the McCarran GDC took place in the office area of the facility and Schulze's in the staging area of the facility, both of which are within steps of time clocks and neither of which are in an area requiring the use of cold gear PPE.  (*See* Ex. F at ¶ 12; Ex. H at ¶ 6.)

Thus, the Plaintiffs pursuing this action demonstrate stark differences in needs and processes for equipment and/or PPE.  Plaintiffs do not, and cannot purport to be, performing *all* GDC warehouse positions, yet they seek to represent two nationwide classes of that magnitude.

**C.**     **<u>Substantial Allegations Of A Common Decision Policy Or Plan Do Not Exist</u>**

Plaintiffs have not made the "requisite showing that they and the proposed [collective action members] were allegedly 'victims of a common policy or plan,' thereby warranting conditional certification." *Johnson v. INTU Corporation,* 2:18-cv-02361-MMD-NJK, 2020 WL 977788, *2 (D. Nev. Feb. 28, 2020).[9]  Both the allegations in the FAC and Plaintiffs' declarations are insufficient to show Defendant had a common plan, policy, or practice that applies to whom Plaintiffs purport to be similarly situated.

**1.**     **Defendant's Policies Prohibit Off-The-Clock Work**

Plaintiffs' attempt to characterize their alleged individualized experiences as a common decision, policy or plan that violates the FLSA is completely contrary to Defendant's *actual* policies and practices.  These policies strictly prohibit Plaintiffs, and all non-exempt associates, from performing any off-the-clock work.  Management guidelines supporting the policy reaffirm this

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. CHARLESTON BLVD.
SUITE 500
LAS VEGAS, NV 89135
TELEPHONE: 702.369.6800

---

[9] The plaintiffs in *Johnson,* along with the potential collective action members, were all subject to materially identical independent contractor agreements.  Plaintiffs in *Johnson* also presented evidence to support their contention that they and their proposed collective action members were all subject to common policies.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. CHARLESTON BLVD.
SUITE 500
LAS VEGAS, NV 89135
TELEPHONE: 702.369.6800

prohibition and both the policy and guidelines provide direction on how to prevent, report, and correct any instances of working-off-the clock.  Plaintiffs' narrative, therefore, begins with their apparent choice to ignore these policies.  Even if true, which Defendant denies and actual evidence refutes, this does not change the fact that the policies *on their face*, prohibit off-the-clock work.  This is a strong factor *against* conditional certification.  *Richie v. Blue Shield of California*, 2014 WL 6982943, at *10 (N.D. Cal. Dec. 9, 2014) ("[T]he presence of express policies prohibiting off-the-clock work…tends to contradict the existence of a 'common policy' and therefore is a factor against FLSA certification); *Richardson v Wells Fargo Bank, N.A.*, 2012 WL 334038 (S.D. Tex. Feb. 2, 2012); *Burch v. Qwest Communications Int'l, Inc.* , 500 F.Supp.2d 1181, 1189 (D. Minn. 2007).  Further, Plaintiffs do not cite to a purported "policy" in their First Amended Complaint; they merely allege that Defendant required them to be "ready to work" which could mean a multitude of things, thus further supporting Defendant's position that these individuals are not similarly situated nor are bound by a common policy for purposes of granting Plaintiffs' Motion.

### 2.      Dry Side Associates Are Not Required To Obtain Equipment Pre-Shift

Plaintiffs' attempt to establish a common practice contrary to Defendant's express policies is fatally flawed.  Their generic narrative of having to retrieve necessary equipment 15 minutes prior to shift start in order to have time to scan their badge at the Systems Window is discredited by the very evidence they suggest supportive.  (*See* ECF No. 14 at ¶ 23.)  The time punch and Systems Assets' assignment data during the pay period identified by Plaintiffs demonstrate that, to the extent any equipment was needed, it was often pre-assigned *hours* prior to shift-start.  This is consistent with the *actual* practice of QA associates pre-assigning and placing equipment in labeled bins for associate retrieval.  On the one date in that time period when equipment was not preassigned, the evidence demonstrates that Nelson retrieved his equipment *after* clocking in, and eleven minutes after his shift started, again consistent with *actual* expected practice of attending start-up meeting *then* retrieving his equipment.  Simply, Plaintiffs' attestations that going to the Systems Window before each shift to obtain equipment is disingenuous, exposing the phantom nature of any alleged common practice to support pre-certification.

/ / /

Moreover, and perhaps even more significantly, Plaintiffs themselves identify a unique, ***not common***, circumstance as the impetus for alleged pre-shift activities. That circumstance, a small group of receiving associates, today approximately twenty for each of two shifts, clocking-in at a time clock located on the receiving dock in the uniquely configured McCarran GDC, cannot be transformed into a nationwide commonality supportive of pre-certification notice. The McCarran GDC is the ***only*** GDC with dry receiving operations on the right side of the building, resulting in the primary work area for dry receiving associates being a short distance across the warehouse. When considering its ***individual*** response in support of an FHP initiative, the McCarran GDC had to account for this configuration. Placing a time clock on the receiving dock so that associates could clock-in and be at their start-up meeting, the goal of which was to begin at shift-start time, in a timely manner was its DIY response. ***All evidence*** in support of that initiative and the McCarran GDC response supports the expectation that associates retrieve equipment ***after*** the start-up meeting. Absent Plaintiffs' self-serving declarations, there is absolutely no evidence suggesting associates were required to have equipment before clocking-in.

### 3. Perishable Side Associates Are Not Required To Don PPE Pre-Shift

Similarly, there is no evidence in support of the fallacy that all perishable side associates are required to don PPE pre-shift. In fact, the narrative that ***all*** perishable side associates are required to, or even choose to, wear freezer gear is inaccurate. Simply, freezer gear is necessary only when working in the freezer chamber of the perishable facility. There is no need, and certainly no requirement, that it be worn at start-up meetings, which do not occur in the freezer component of the warehouse. In fact, some associates working on the perishable side of the facility may even have their start-up meeting in the office portion of the warehouse. This was true for Nelson when he was assigned to a QA inventory control position responsible for quality control tasks in the perishable part of the warehouse. To suggest that he was required to come to his start-up in head-to-toe freezer gear is inaccurate and disingenuous. The same is true with for Schulze.

### D. If Certified, The Class Should Be Limited To McCarran And Pageland GDCs

To the extent the Court conditionally certifies the class, it should be limited to the McCarran and Pageland GDCs. Plaintiff has the burden of establishing that the defined classes ***nationwide***

17

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV 89135
Telephone: 702.369.6800

were subjected to the same policy or practice.  *Davis, III v. Westgate Planet Hollywood Las Vegas, LLC.*, no. 2:08–cv–00722–RCJ–PAL, 2009 WL 102735 *12-14 (D. Nev. 2009) (denying request to circulate nationwide notice when plaintiff's proof is limited to specific employees at specific locations); *see also Gamble v. Boyd Gaming Corp.,* 2:13–CV–1009 JCM-PAL, 2014 WL 2573899 at * 3 (D. Nev. June 6, 2014); *Hinojos v. Home Depot, Inc.,* no. 2:06–cv–00108, 2006 WL 3712944, at *6 (D. Nev. Dec. 1, 2006) (denying request of plaintiff for nationwide circulation of notice when proof limited to six plaintiffs who worked at three Home Depot stores in Las Vegas, refusing to "conclude that a nationwide policy exists based on limited assertions pertaining to a few stores"); *Fetrow–Fix,* 2011 WL 6938594, at *8 (denying request to circulate nationwide notice); *Cholette v. Installpro, Inc.,* 2:10-CV-02153-KJD, 2012 WL 2190844 (D. Nev. June 13, 2012) (Plaintiff also sought certification of IPRO technicians in other states; plaintiff's speculations regarding a single company-wide policy or plan which violates FLSA are unsupported); *Torres v. CSK Auto, Inc.,* EP 03 CA 113(KC), 2003 WL 24330020 (W.D. Tex. Dec. 17, 2003) ("Left to determine whether the present case is an appropriate case for a broader action, this Court must conclude that the affidavits of local employees who restate, without attribution, the concerns of distant employees and theorize that the problem is widespread will not suffice.")

Plaintiffs only submit Declarations from Associates at the McCarran and Pageland GDCs. The declarations merely speak as to what they **believe** generally happens at "Wal-Mart" in a conclusory fashion without admitting that the Plaintiffs have no idea what goes on at other locations, in other positions, etc.  These Declarations simply do not provide any basis to support their contention that Defendant's GDCs outside of McCarran and Pageland are similarly situated or that putative plaintiffs at other GDCs are similarly situated for the reasons previously discussed herein. *See David, III, supra.*

**E.   To The Extent The Court Grants Any Type of Collective Action, Plaintiff's Proposed Notice Requires Significant Modification**

Plaintiff has proposed a defective Notice for distribution.  Because the Motion should be denied for failing to meet the burden under § 216(b), concerns about the proposed Notice are moot. However, even if notice was justified, the proposed Notice requires substantial modifications.

**1.    Plaintiffs' Notice Inaccurately Describes The Classes**

The class definition in the Notice is drastically different from that contained in Plaintiffs' FAC and Motion.   For example, the FAC and Motion identify the FLSA Dry Section Class as follows:

> All non-exempt hourly paid food distribution warehouse employees who (i) were employed by Defendant in the United States at any time within 3 years from the filing of the original complaint in this action; (ii) worked in the dry section of the food distribution warehouse, and (iii) were required to retrieve a scanner, printer, or other electronic device, pre-shift.

(ECF No. 14, p. 8; *see also* ECF No. 37, p. 3.)   The proposed notice lacks these specifics for the FLSA Dry Section Class.  (*See generally,* ECF No. 37-1.)  The same is true of the FLSA Cold Section Class definition:  the FAC and Motion define the Cold Section Class as follows:

> All non-exempt hourly paid food distribution warehouse employees who (i) were employed by Defendant in the United States at any time within 3 years from the filing of the original complaint in this action, (ii) worked in the cold section of the food distribution warehouse, and (iii) were required to don cold storage personal protective equipment (PPE) pre shift.

(ECF No. 14, p. 9; *see also* ECF No. 37, p. 3.); however, this information is missing from the Proposed Notice.  (*See generally,* ECF No. 37-1.)  The definitions are also vague with respect to the term "pre-shift" and should be modified to reflect Plaintiffs' claims that they were required to/forced to the alleged activities off-the-clock and/or prior to clocking in.   Additionally, for the proposed dry class, Plaintiffs identify an end point, of June/July 2021, which should be incorporated into any distributed notice.

Plaintiffs should not be able to attempt distribution on a nationwide basis ***without*** accounting for critical components, including the evidence that would appropriately limit any proposed Notice to, at most, dry receiving associates at McCarran GDC and absence of the June/July 2021 end date of alleged common practice, as identified by the McCarran GDC Plaintiffs.  Further, the cold section class should be limited to McCarran and Pageland GDCs and, even further, those associates who work in the freezer as those are the only associates who may don the purported PPE.

If the Court grants conditional certification, Defendant requests further briefing on the Notice.

### 2.   The Notice Incorrectly Suggests The Need To Be Represented By Plaintiffs' Counsel

Further, Plaintiffs' Notice strongly, but incorrectly, suggests putative Plaintiffs who wish to participate in this case must be represented by Plaintiffs' counsel.  For example, paragraph (3) under "Effect of Joining This Suit" incorrectly states that joining this lawsuit means putative Plaintiffs must "enter into an agreement with Plaintiff's counsel."  Later, in the same section, the proposed Notice mistakenly refers to "The attorney for the Plaintiff's classes," even though there are no "classes" in a collective action and no one is obligated to be represented by Plaintiffs' counsel.  Likewise, the "Your Legal Representation If You Join" section only lists Plaintiffs' counsel as an option.  These statements should be removed.  The Notice should expressly provide that any putative Plaintiff is free to select his or her own counsel, or to proceed *pro se*.  *See Reno v. Western Cab Company,* 2:18-cv-00840-APG-NJK, 2019 WL 8062561, *4 (D. Nev. Jan. 17, 2019) ("[T]here are no class representatives in FLSA collective actions, and putative plaintiffs can opt-in and retain different counsel or represent themselves.").  Notice of the right to participate *pro se* would be particularly important since the notice states "The attorneys for the Plaintiff's classes are being paid on a contingency fee basis," and any potential recovery would therefore be reduced by such fees.

### 3.   The Notice Fails To Inform Putative Plaintiffs About Fees And Costs

Plaintiffs' proposed Notice also fails to inform putative Plaintiffs the percentage of fees Plaintiffs agree to pay counsel, how this is calculated, and that the issue will ultimately be decided by the court.  *Lescinsky v. Clark County School District,* 539 F. Supp.3d 1121, 1130 (D. Nev. 2021)(*citing Dualan v. Jacob Transp. Servs., LLC,* 172 F.Supp.3d 1138, 1151 (D. Nev. 2016); *see also Pittman v. Westgate Planet Hollywood as Vegas, LLC,* no. 2:09-00878-PMP-GWF, 2009 WL 10693400, at *10 (D. Nev. Sept. 1, 2009).  As such, the Notice requires amending to include this information.

/ / /

/ / /

/ / /

/ / /

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV 89135
Telephone: 702.369.6800

### 4.     The Notice Incorrectly Suggests This Is A Representative Action

Plaintiffs' proposed Notice also incorrectly suggests, for example in its "Effect of Joining This Suit" section, that this is a "representative" action.  It is not.  Although courts often conflate actions under § 216(b) with Rule 23 "representative" actions, it is important for putative Plaintiffs to understand that the consequence of joining the action is that they become "party plaintiff[s]" subject to the risks and burdens of FLSA litigation. 29 U.S.C. § 216(b).  *See also Bonilla v. Las Vegas Cigar Co.*, 61 F. Supp. 2d 1129, 1132 (D. Nev. 1999) (recognizing and exploring differences between § 216(b) and Rule 23 actions).  Unlike Rule 23 class actions, in which class members are simply part of an independent legal "class" entity, § 216(b) merely provides a "joinder process" by which others are notified of the opportunity to become plaintiffs in their own name.  *See Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 n. 1, 1530 (2013) (*abrogated on other grounds in Joiner v. SVM Management, LLC,* 202 Ill. 124671 (Feb. 21, 2020); *see also Ervin v. OS Rest. Serv., Inc.*, 632 F.3d 971, 977-78 (7th Cir. 2011) (describing how the Portal-to-Portal Act amended the FLSA to eliminate "representative actions" and add "opt-in provision" "to limit private FLSA plaintiffs to employees who asserted claims in their own right and free employers of the burden of representative actions.") (*citing Sperling*, 493 U.S. at 173)).

Plaintiffs' proposed Notice fails to inform putative Plaintiffs they may be required to provide deposition or trial testimony in this District and they may be required to participate in written discovery by providing responses, records, and electronic documents.  *Daniels*, 2013 WL 1758891, *5 (finding notice should include "language stating that potential plaintiffs may be required to provide deposition testimony or courtroom testimony" because "[i]t is appropriate to include language informing potential plaintiffs of possible obligations in the event they elect to opt-in").  Opt-in plaintiffs are subject to discovery because, among other reasons, such discovery is essential to the defendant's right to move to decertify any conditionally certified collective action based on such discovery.  *See, e.g. Abubakar v. City of Solano*, 2008 WL 508911, *2 (E.D. Cal. Feb. 22, 2008); *Coldiron v. Pizza Hut, Inc*., 2004 WL 2601180, *2 (C.D. Cal. Oct. 25, 2004).

/ / /

/ / /

### 5. Notice Improperly Encourages Joining The Lawsuit

The proposed Notice also improperly encourages putative Plaintiffs to join the lawsuit, thus violating the Supreme Court's prohibition against apparent judicial endorsement and crossing the line between information and solicitation. Plaintiffs have included the case caption on their proposed Notice and the caption violates the Supreme Court's warning that "trial courts must take care to avoid even the appearance of judicial endorsement of the merits of the action." *Schemkes v. Presidential Limousine*, 2011 WL 868182, at *4 (D. Nev. Mar. 10, 2011) (*quoting Hoffmann–LaRoche Inc.*, 493 U.S. at 174). "The notice . . . should avoid any bold heading that includes the court's name on plaintiff's proposed notice; as such a heading might suggest to potential plaintiffs that the court has lent its imprimatur to the merits of this case." *Gayle v. U.S.*, 85 Fed. Cl. 72, 81 (Fed. Cl. 2008); *see also Prentice v. Fund for Pub. Interest Rsch, Inc.,* 2007 WL 2729187, at *5 (N.D. Cal. Sept. 18, 2007) ("Including the full caption may give a false impression of judicial endorsement of Plaintiffs' position where none exists."). Similarly, presenting the notice over the court's signature suggests judicial endorsement. *See Cardoza v. Bloomin Brands, Inc.,* 2014 WL 5454178, *6 (D. Nev. Oct. 24, 2014) ("titling the document a 'court-authorized notice' creates the appearance of judicial endorsement of this action instead of just the form of the notice."); *see also Gonzalez v. Diamond Resorts Int'l Mktg., Inc.,* No. 2:18-cv-00979-APG-CWH, 2019 WL 3430770, at *4 (D. Nev. July 29, 2019).

The form and content of Plaintiffs' proposed Notice also improperly urges participation in this lawsuit, and thus it crosses the line from providing information to soliciting litigation. Communications during the opt-in period are supposed to be limited to communications approved by the Court. *See, e.g., Hipp v. Liberty Nat'l Life Ins. Co*., 164 F.R.D. 574, 576 (M.D. Fla. 1996). Likewise, the Court has a "responsibility to avoid the 'stirring up' of litigation through solicitation." *Severtson v. Philips Beverage Co*., 137 F.R.D. 264, 266-67 (D. Minn. 1991). Yet, in the "Further Information" and "Your Legal Representation If You Join" sections of the proposed Notice, Plaintiff invites unapproved communications *via* telephone and e-mail. The "Further Information" section should be stricken in its entirety, and Plaintiffs' counsel's telephone number and e-mail addresses should also be eliminated.

22

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. CHARLESTON BLVD.
SUITE 500
LAS VEGAS, NV 89135
TELEPHONE: 702.369.6800

### 6.   Defendant's Position Should Be More Adequately Represented

Plaintiffs' proposed Notice includes a lengthy and inaccurate section entitled "Description of the Lawsuit" ostensibly detailing Plaintiffs' allegations in this case.   The only reference to Defendant's position is that "Defendant denies Plaintiff's claims and that it is liable to (sic) for any damages resulting from this lawsuit."  (ECF No. 37-1, p. 3.)  This description ignores Defendant's position it properly compensated employees, including Plaintiffs and putative Plaintiffs, and Defendant vigorously defends accusations their policies and practices violate the FLSA.  Defendant should be allowed to respond to Plaintiffs' detailed allegations in the proposed Notice, such that there is greater parity regarding the parties' respective positions.  *See Delara v. Diamond Resorts Int'l Marketing, Inc.,* 2:19-cv-00022-APG-NJK, 2020 WL 2085957, at *3 (D. Nev. Apr. 30, 2020); *Hoffman*, 2008 WL 5054684 at *15 (permitting defendant to "incorporate language indicating not only that Defendant denies Plaintiffs' allegations, but that it is also defending against those same allegations).

### 7.   Statute Of Limitations Period Language Should Be Revised

Plaintiffs' Notice incorrectly identifies the relevant starting point as December 23, 2017, which is three years before Nelson filed the Complaint.  (ECF No. 1-2.)  The statute of limitations for an FLSA claims is two years, *unless* the violation is willful.  *See* 29 U.S.C. § 255(a).  Plaintiff has made no showing of willfulness.[10]  Thus, the starting point for notice, if any, should be two years before the lawsuit was filed, or December 23, 2018.  *Bonilla*, 61 F. Supp. 2d at 1136-39.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[10] Because the issue of whether Defendant acted willfully is a merits question, the Notice should properly refer to both limitation periods.

**III.** **CONCLUSION**

For the reasons detailed herein, Plaintiffs' Motion for Conditional Certification should be denied in its entirety.  If not, the Notice should be revised as indicated herein, including who the Notice should be sent to, *i.e.* only those impacted GDC associates in Nevada and South Carolina.

DATED this 16th day of June, 2022.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.


*/s/ Anthony L. Martin*
Anthony L. Martin
Nevada Bar No. 8177
Dana B. Salmonson
Nevada Bar No. 11180
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV  89135
*Attorneys for Defendant Wal-Mart Associates, Inc.*

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
10801 W. Charleston Blvd.
Suite 500
Las Vegas, NV 89135
Telephone: 702.369.6800

## CERTIFICATE OF SERVICE

I hereby certify that I electronically transmitted the foregoing **DEFENDANT'S OPPOSITION TO PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CIRCULATION OF NOTICE PURSUANT TO 29 U.S.C. §216(b)** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant:

> Mark R. Thierman
> Joshua D. Buck
> Leah L. Jones
> Joshua R. Hendrickson

Pursuant to FRCP 5(b), I hereby further certify that service of the foregoing document was also made by depositing a true and correct copy of same for mailing, first class mail, postage prepaid thereon, at Las Vegas, Nevada, to the following:

Mark R. Thierman
Joshua D. Buck
Leah L. Jones
Joshua R. Hendrickson
Thierman Buck LLP
7287 Lakeside Drive
Reno, NV  89511
*Attorneys for Plaintiff*

DATED this 16th day of June, 2022.

/s/ Monica Gonzalez
An Employee of OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

25

51907669.v1-OGLETREE